Melvin A. **MARSHALL**, Plaintiff,

v.

**DISTRICT OF COLUMBIA** et al.,
**Defendants.**

Civ. A. No. 74–990.

United States District Court,
District of Columbia.

April 11, 1975.

Martin L. Grossman, Asst. Corp. Counsel, Washington, D. C., for defendants.

Christine Dennis LeFlore, Washington, D. C., for plaintiff.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

This claim is now before the Court on cross-motions for summary judgment on paragraphs seven and eight of the plaintiff's second amended complaint. The plaintiff was hired by the Metropolitan Police Department of the District of Columbia on September 30, 1974, and was assigned to work as an undercover officer. On December 9, 1974, the plaintiff was transferred to the Police Academy, and was told he would have to cut his hair and beard to conform to the personal appearance and grooming requirements of Metropolitan Police Department General Order 1102.3.[1] The plaintiff informed the Police Department that he had taken a religious vow not to cut his hair or beard, and requested a waiver of the General Order. Although his request was not formally denied, the plaintiff was suspended on December 11, 1974. Thereafter, by letter dated January 23, 1975, he was offi-cially terminated for failure to comply with General Order 1102.3. The letter also informed the plaintiff that no appeal from the dismissal was available.

The plaintiff now seeks to be reinstated on the Police Force, with back pay and tenure rights, without being forced to cut his hair or beard. He grounds his claim on three theories, and seeks a declaratory judgment as to each. *First,* he contends that his dismissal was violative of his First Amendment right to freely exercise his religion. *Second,* he argues that the General Order violates his rights to due process and equal protection. *Third,* he argues that the Order is illegal under the D.C. Human Rights Law and D.C. Code § 4–130. This Court's jurisdiction is based upon 28 U.S.C. 1331(a).

I. GENERAL ORDER 1102.3 DOES NOT VIOLATE THE PLAINTIFF'S RIGHTS UNDER THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT.

■ The First Amendment issue raised by the plaintiff is a question of first impression in this Court. There does not appear to be a firm test uniformly applied in determining whether a statute or regulation is violative of the Free Exercise Clause.[2] While one test

---

1. General Order 1102.3 provides in pertinent part: "Part I(E)(2). *Hair:* Hair shall be neat, clean and trimmed to present a groomed appearance. It shall not be of such length that it prevents the uniform hat from fitting securely on the head. Hair on the sides of the head may touch the top of the ears, but shall not cover any portion of the outside surface of the ear. Hair on the back of the head may touch, but shall not extend over the shirt collar. The hair shall be groomed so that when the member is cov-ered the hair does not fall below the eyebrows or bunch out to the front, side, rear of the band of the headgear. Plaited or braided hair shall not be permitted. (See attachment B.)

    \*     \*     \*     \*     \*

    (4) . . . beards and goatees are prohibited."

2. Although the plaintiff does not  lege in his complaint that his dismissal wε  .n violation

of the Equal Employment Opportunity Act, 42 U.S.C. 2000e–16 (Supp. II, 1972), he argues that the appropriate test to be applied in evaluating the validity of his First Amendment claim is identical to that prescribed under the statute. However, while the Court is aware of cases decided under the EEOA, it views them as helpful, but not controlling. *See* Davis v. Washington, 512 F.2d 956 at 957, 958 (D.C.Cir., 1975). Counsel have failed to inform the Court of the equatability of the statutory standard with the constitutional standards, and without further authority to support that proposition, the Court is obligated to apply the tests established under the First Amendment.

Standards prescribed by the EEOA may be more or less stringent than those established by judicial interpretation of the Constitution. If the legislative requirements are stricter than those prescribed by the courts, in the absence of an EEOA allegation in his com-

has been whether the statute is necessary to promote a compelling state interest, Sherbert v. Verner, 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), this Court finds most appropriate the test enunciated in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); that is, whether the government interest to be furthered is "of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." 406 U.S. at 214, 92 S.Ct. at 1532.

General Order 1102.3 was issued on December 8, 1974 in response to citizen complaints about the appearance of police officers and because there was a "consensus" among police officials that relaxed grooming standards had resulted in the deterioration of the appearance of officers. (Affidavit of Maurice Cullinane, pp. 1–2, hereinafter "Affidavit"). In his affidavit, Maurice Cullinane, then Assistance Chief of Police for Field Operations and chairman of a committee charged by the Chief of Police with reviewing the department's appearance regulations, stated that, in his professional opinion, appearance standards are "essential, to the effective functioning of the department." (Affidavit, p. 4). He further explained the need for the regulations:

> "One of the responsibilities of the force is to act as a deterrent to crime and as a visible symbol of lawful authority. In order to fulfill this responsibility, it is necessary that uniformed officers on the street be highly visible and quickly recognizable as police officers. For this reason, it is necessary for officers to have a dis-

tinctive and uniform appearance.
. . .

> While the wearing of a uniform goes far towards creating a uniform appearance, grooming was also a factor considered by the committee in drafting the order."

(Affidavit, pp. 4–5). Easy identification of individuals as police officers is deemed by the Police Department to be necessary to ensure that citizens are aware of police presence, that orders of police officers will be obeyed, and to encourage citizens to come to the aid of a police officer in distress. Chief Cullinane further stated that the hair length and beard provisions of the order are designed to promote the projection by officers of a

> "neutral image that would not provoke a strong negative reaction from any segment of the community, as well as an image that was sufficiently compatible with the traditional look of the uniformed officer so as not to raise questions in the minds of citizens as to whether a uniformed officer was really a police officer, in spite of his uniform."

(Affidavit, p. 6)

It appears to the Court that the provisions of General Order 1102.3 further a substantial governmental interest, namely, the projection of an image which facilitates the effective functioning of the police department necessary to ensure the safety and security of our citizens.[3]

The Court is faced, however, with deciding whether the interest described in the preceding paragraph is "of suffi-

---

plaint, the plaintiff cannot successfully contend that the court must apply the statutory standard.

Therefore, the Court will interpret the validity of General Order 1102.3 in accordance with the standards established by the courts under the First Amendment, using the EEOA regulations only for "additional instruction". *Davis, supra,* 512 F.2d at 957, n. 2.

3. The importance of this interest has been widely recognized. *See, e. g.,* Stradley v.

Andersen, 478 F.2d 188 (8th Cir. 1973); Ashley v. City of Macon, Georgia, 377 F. Supp. 540 (M.D.Georgia 1974); Burback v. Goldschmidt, 521 P.2d 5 (Or.App.1974); Akridge v. Barres, 122 N.J.Super. 476, 300 A.2d 866 (App.Div.1973); aff'd 65 N.J. 266, 321 A.2d 230 (1974); Greenwald v. Frank, 70 Misc.2d 632, 334 N.Y.S.2d 680 (Sup.Ct. Nassau), aff'd and j' mod. 40 A.D.2d 717, 337 N.Y.S.2d 225 (1972), aff'd 32 N.Y.2d 826, 346 N.Y.S.2d 529, 299 N.E.2d 895 (1973).

cient magnitude to override" plaintiff's freedom of religion interest.

The plaintiff alleges that General Order 1102.3 places an indirect burden on his free exercise of his religion, in that the Police Department has forced him to choose between his religious beliefs and economic hardship. The Court does not view the plaintiff's loss of employment as a severe economic hardship. Unlike the plaintiff in *Sherbert, supra,* he is not being denied sustenance; there appears to be no reason why he cannot successfully seek a different type of employment where he will be permitted to wear his hair and beard as his religious views dictate.[4]

The fact remains, however, that the plaintiff's free exercise of his religious beliefs is in conflict with the police regulations. The Court is fully aware that: "The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious *beliefs* as such, Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213." *Sherbert, supra,* 374 U.S. at 402, 83 S.Ct. at 1793. It is a basic tenet of our society that: "The freedom to hold religious beliefs and opinions is absolute." Braunfeld v. Brown, *supra,* 366 U.S. 599 at 603, 81 S.Ct. 1144 at 1146, 6 L.Ed.2d 563. It is clear, however, that the police regulation in question makes no attempt to deny the plaintiff his right to hold his religious beliefs. Rather, an assumedly unforeseen collateral effect of the General Order is to force the plaintiff to violate his religious convictions if he wishes to be a police officer. Thus, the question is whether the defendants should be compelled to accommodate plaintiff's religious conviction.

This Court does not believe that the police department should be required to make an exception for the plaintiff so that he may pursue the career of his choice while maintaining inviolate his religious vow. The appearance regulations promote an interest which, in light of the facts of this case, outweigh the plaintiff's interest in maintaining his hair and beard as his religious beliefs dictate. The Court finds that the appearance provisions of General Order 1102.3 do not unconstitutionally infringe upon the plaintiff's free exercise rights. "Religious discrimination should not be equated with failure to accommodate." Dawson v. Mizell, 325 F.Supp. 511, 514 (E.D.Va.1971).

This result is necessitated by the nature and diversity of modern society. The Supreme Court, in wrestling with the conflict between an individual's religious beliefs and a state statute which indirectly burdened the free exercise of those beliefs, concluded:

> "Abhorrence of religious persecution and intolerance is a basic part of our heritage. But we are a cosmopolitan nation made up of people of almost every conceivable religious preference. These denominations number almost three hundred. Year Book of American Churches for 1958, 257 et seq. Consequently, it cannot be expected, much less required, that legislators enact no law regulating conduct that may in some way result in an economic disadvantage to some religious sects and not to others because of the speical practices of the various religions."

*Braunfeld, supra,* 366 U.S. at 606, 81 S. Ct. at 1147.

The Supreme Court further held in *Braunfeld,* however, that a secular statute which indirectly imposes a burden on relgous observance will be valid only if the government cannot "accomplish

---

4. The Court cannot be unmindful of the fact that it was the plaintiff's own choice of employment which made him subject to the regulation, the required compliance with which would force him to compromise his religious beliefs. He sought a type of employment in which dress and grooming requirements are more likely to be imposed than in many other job areas. Here, unlike the situation in *Sherbert, supra,* or *Braunfeld, supra,* the government did not, in a sense, seek the plaintiff out; rather, the plaintiff, by joining the police force, placed himself in the situation he now contests.

its purpose by means which do not impose such a burden." 366 U.S. at 607, 81 S.Ct. at 1148. Here, the very purpose of the General Order is to project a neutral image of police officers which will promote quick and sure identification so that an officer's authority will not be questioned, and his orders obeyed, and to encourage people to come to his aid when he is in distress. If the Court were to require the police department to allow the plaintiff to maintain his hair and beard as his religion dictates, the interests to be promoted by the regulation would be wholly undermined. The plaintiff has not suggested any alternative method of achieving these goals, nor is an effective method readily apparent to the Court.

■ Of course, the Police Department could assign the plaintiff as an undercover officer, where the goals of police image would not obtain. However, even setting aside the training academy requirement and the potential need of the Police Department to assign the plaintiff to work as a uniformed officer, this Court cannot require the Metropolitan Police Department to hire an individual to fill a particular position on the police force. Even were the Court to assume it has the expertise to determine whether the plaintiff would be suited to work as an undercover agent, compelling the Police Department to so hire and assign him would constitute an undue interference by the Court in the internal administration of the department.

Therefore, the Court holds that the grooming provisions of General Order 1102.3 do not constitute a violation of the plaintiff's rights under the Free Exercise Clause.[5]

## II. GENERAL ORDER 1102.3 IS NOT ARBITRARY OR CAPRICIOUS, NOR DOES IT DEPRIVE THE PLAINTIFF OF HIS RIGHTS TO DUE PROCESS AND EQUAL PROTECTION.

■ The plaintiff further alleges that General Order 1102.3 is arbitrary and capricious and violative of his constitutional right to wear his hair and beard according to his personal preference.[6] The circuits are split on the question of whether such a right does exist. The decisions of the Court of Appeals for the District of Columbia Circuit reflect the conflicting views. In Fagan v. National Cash Register Co., 157 U.S.App.D.C. 15, 481 F.2d 1115 (1973), the Court of Appeals refused to consider on the merits the claim of the plaintiff, a private employee, that the employer's hair length regulations constituted an invasion of his "liberties and privacy". After reviewing the "hair cases" in other circuits, and the frequent denial of certiorari by the Supreme Court in those cases, the Court of Appeals concluded that: "We may fairly assume this much, it would appear, the Supreme Court sees no federal question in this area." 481 F.2d at 1119.

■ However, in the recent decision of Brown v. D. C. Transit System, Inc., No. 73–2089 (D.C. Cir., Feb. 28, 1975), the Court stated:

"Of course individual citizens have a constitutional right to wear

---

5. In Cupit v. Baton Rouge Police Department, 277 So.2d 454 (La.App.1973), appeal writ denied, 281 So.2d 745 (1973) the court upheld a police grooming regulation against a Free Exercise attack similar to that asserted by the plaintiff in this case. The Louisiana court, however, tested the validity of the police regulation against the lesser standard of "rational relation", which standard this Court finds inappropriate.

6. The plaintiff attacks the General Order on equal protection grounds as well. However, the Court is unable to discern the exact nature of his contention. Because the plaintiff has cited a case in which the constitutional right to wear one's hair as one chooses was founded in the equal protection clause of the 14th Amendment, the Court will treat the plaintiff's assertion of this right as both a due process and an equal protection claim. For further discussion of the plaintiff's equal protection rights, see pp. 1017–1018, infra.

beards, sideburns, and mustaches in any form and to any length they may choose."

Slip Opinion at 8. Although *obiter*, this Court is not only inclined to follow the indication in *Brown* of the present position of the Court of Appeals, but also believes it to be the better view of the law.[7] *See* Union Pacific Railway Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891).

■ The right to wear one's hair and beard as one chooses is not, however, absolute, *see* Stradley v. Andersen, 478 F. 2d 188, 190 (8th Cir. 1973), nor is it a fundamental right. Thus, while a policeman does not surrender his constitutional rights upon joining the police force, *see* Garrity v. State of New Jersey, 385 U.S. 493, 499–500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), the police regulation in question will be upheld if it is reasonably related to a legitimate governmental interest. *See e. g.*, Dwen v. Barry, 483 F.2d 1126, 1130 (2d Cir. 1973); Burback v. Goldschmidt, 521 P. 2d 5, 8 (Or.App.1974 ).[8] For the reasons stated at pp. 1014–1015, *supra*, this Court holds that General Order 1102.3 is not arbitrary nor capricious, and is valid under the above-stated test.[9]

This Court takes note of the fact that the procedure used by the Police Department in drafting the Order, outlined in Chief Cullinane's affidavit, included the formulation of a drafting committee, the distribution of questionnaires to all members of the police force and consultation with the officers' union. The procedures indicate that the Department reached its decision after serious consideration of the matter, and it appears to the Court, contrary to the plaintiff's allegations, that the department founded the Order upon rational bases, and attempted to accommodate, as far as was consistent with the purposes of the Order, the personal free expression rights of the police officers.

Furthermore, this Court does not find that General Order 1102.3 impermissibly excludes the plaintiff from the police force in violation of equal protection. It is this Court's view that the personnel of the Police Department should reflect the diversity of the community which they serve. Such a policy tends to increase the respect for and the effectiveness of the police. This does not mean, however, that the department is obligated to accommodate every segment of our very cosmopolitan Washington population. Therefore, the Court is unable to say that the department denied this plaintiff the equal protection of the law. While the Police Department may, at

---

7. In *Brown*, the plaintiffs, bus drivers employed by the D.C. Transit System (hereinafter, "Transit"), were fired for failure to conform to the grooming requirements established in a Transit regulation. The plaintiffs contended that the regulation was violative of their substantive due process rights under the Fifth Amendment. The Court of Appeals concluded that Transit was a private employer, and held that because there was no state action, the plaintiffs could not establish a due process claim under the Fifth Amendment. The court further stated that it was expressing no view as to the possible merits of a due process claim in a situation involving state action. Slip Opinion n. 10 at 9–10. Because the instant case clearly involves state action, the holdings in *Fagan*, *supra*, and *Brown*, *supra*, are distinguishable.

8. Some courts have declined to classify the right involved in hair cases as fundamental or non-fundamental, and have employed a balancing test to determine the validity of the regulations in question. *See, e. g.*, *Stradley, supra*, 478 F.2d at 190–91; Massie v. Henry, 455 F.2d 779 (4th Cir. 1972), and cases cited therein; Greenwald v. Frank, 70 Misc.2d 632, 334 N.Y.S.2d 680 (1972), aff'd and j. mod'd 40 A.D.2d 717, 337 N.Y.S.2d 225 (1972), aff'd 32 N.Y.2d 826, 346 N.Y.S.2d 529, 299 N.E.2d 895 (1973). Under the balancing test, General Order 1102.3 is valid. The need of the police department to project a neutral image and to have officers be easily identifiable is, under the circumstances, a stronger interest than the right of the individual officer to wear his hair and beard according to personal preference. While recognizing the plaintiff's constitutional right in this area, the Court believes that the legitimate goals of the Police Department override the plaintiff's right.

9. This Court is aware of no court which has held to the contrary. *See* n. 3, *supra*.

**1018**

some future time, consider it feasible and desirable to place individuals like the instant plaintiff on the force, that decision is not for the Court to make, and is not required by the Fifth Amendment.

### III. THE COURT WILL DECLINE TO EXERCISE PENDENT JURISDICTION OVER STATE CLAIMS WHERE THE FEDERAL CLAIMS ARE RESOLVED ON A MOTION FOR SUMMARY JUDGMENT.

Having found that the plaintiff cannot succeed on the merits of his constitutional claims, the Court must now determine whether it should consider the merits of the plaintiff's arguments which are based upon provisions of the laws of the District of Columbia. The plaintiff contends that General Order 1102.3 is invalid, first, because the Police Department did not have the authority to issue the Order, D.C.Code § 4–130, and, second, because the Order violates Section 11.1(a)(1) of the District of Columbia Human Rights Law. Regulations 73–22, 20 D.C. Reg. No. 10 at 345, 351, Nov. 19, 1973. Under the standards established in United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Court must decline to consider the merits of the plaintiff's District of Columbia law contentions.

Although the plaintiff's federal and local law claims "derive from a common nucleus of operative fact," *Gibbs, supra,* 383 U.S. at 725, 86 S.Ct. at 1138, "it has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Id.* at 726, 86 S.Ct. at 1139. Where, as here, the plaintiff's federal claims are disposed of on a motion for summary judgment, comity and justice require that the Court dismiss the local law claims. *Id.* Kavid v. A. L. Stamm & Co., 491 F. 2d 1176, 1180 (2d Cir. 1974); Brough v. United Steelworkers of America, AFL–CIO, 437 F.2d 748, 750 (1st Cir. 1971);

McFaddin Express, Inc. v. Adley Corporation, 346 F.2d 424, 427 (2d Cir. 1965) cert. denied, 382 U.S. 1026, 86 S.Ct. 643, 15 L.Ed.2d 539 (1966). Hart and Weschler, The Federal Courts and the Federal System 925 (2d Ed. 1973). This dismissal will "promote justice between the parties, by procuring for them a surer-footed reading of [the] applicable law" by the local courts. *Gibbs, supra,* 383 U.S. at 726, 86 S.Ct. at 1139 (footnote omitted). Furthermore, there appear in this case no factors of judicial economy, convenience or fairness which would militate against dismissal.

The Court has issued an order of even date in accord with the foregoing.